Filed 1/19/22  In re A.M. CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | |
| | E076625 |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br>    Plaintiff and Respondent,<br>v.<br>M.M. et al.,<br>    Defendants and Appellants. | (Super.Ct. Nos. J277041 & J283067)<br><br>OPINION |
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | |
| | E076900 |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br>    Plaintiff and Respondent,<br>v.<br>S.L. et al.,<br>    Defendants and Appellants. | |
| In re S.K., a Person Coming Under the Juvenile Court Law. | |
| | E076901 |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br>    Plaintiff and Respondent,<br>v.<br>S.L.,<br>    Defendant and Appellant. | (Super.Ct. No. J277042) |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed.

Jacques Alexander Love and Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant M.M.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant S.L.

Michelle D. Blakemore, County Counsel, and Pamela J. Walls, Special Counsel, for Plaintiff and Respondent.

This opinion decides three consolidated appeals brought by the parents of A.M. and M.M.jr (sometimes referred to as the children) and the mother of S.K.[1] The parents, M.M. (father) and S.L. (mother), appeal the order terminating their parental rights to the children. (Welf. & Inst. Code,[2] § 366.26.) Collectively, they contend the juvenile court (1) erred by summarily denying their section 388 petitions, (2) denied them due process by terminating visitation with the children and, therefore, harming their ability to establish the parental bond exception to adoption, and (3) abused its discretion in rejecting their request for a bonding study on the connection they share with the children. They also challenge the sufficiency of the evidence to support the finding that the children are adoptable. Separately, mother asserts that she was denied due process when

---

[1] The appeal in No. E076625, father's first, has been designated as the master file. We have ordered that the records in father's second appeal (No. E076900) and mother's individual appeal (No. E076901) be consolidated in this appeal. Each parent joins in and adopts the other parent's arguments that apply to both.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

the court found her visitation with S.K. to be detrimental and terminated all maternal contact. We affirm.

## I. PROCEDURAL BACKGROUND AND FACTS[3]

Both father and mother have a history with social services agencies.

### A. *Initiation of Dependency Proceedings in Sonoma County.*

#### 1. *Initiation of dependency proceedings for F.K. and S.K.*

In February 2017, Sonoma County Children Services (SCCS) initiated dependency proceedings pursuant to section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of sibling) and removed mother's older children F.K. and S.K. (sometimes referred to as the siblings) based on her failure to treat F.K. with lifesaving heart surgery (opting to treat him based on the recommendation of a naturopath) and provide S.K. with necessary dental and medical treatment.[4] (*In re S.K.*, *supra*, E074453; see *Sonoma County Health Services Dept. v. S.L. et al.* (*In re F.K. et al.*) (Sept. 20, 2019, A154789) [nonpub. opn.]).) On May 18, 2017, the juvenile court found the allegations as to the siblings to be true and ordered supervised visitation and reunification services. (*Ibid.*)

---

[3] On our own motion and to compile a coherent narrative, we take judicial notice of our prior nonpublished opinion. (See *CFS v. S.L. et al.* (*In re S.K. et al.*) (Oct. 20, 2020, E074453) [nonpub. opn.]; Evid. Code, §§ 452, subd. (d), 459, subd. (a); Cal. Rules of Court, rule 8.1115(b)(1).)

[4] Father is not the biological father of F.K. and S.K. (*In re S.K.*, *supra*, E074453.)

3

### 2. *Initiation of dependency proceedings for A.M.*

Mother was living with father and gave birth to her third (father's first) child, A.M., in May 2017. (*In re S.K.*, *supra*, E074453.) SCCS initiated dependency proceedings for A.M. On July 27, 2017, the court declared him a dependent of the court in the parents' physical custody and ordered reunification services.

### 3. *Subsequent dependency proceedings for the siblings and A.M.*

On October 26, 2017, SCCS filed subsequent petitions, pursuant to section 342, alleging the siblings came within section 300, subdivision (d), because they had been sexually abused and exposed to multiple pornographic films depicting child on child sexual encounters. (*In re S.K.*, *supra*, E074453.) The section 342 petition concerning A.M. alleged that he was at risk of sexual abuse because of the siblings' abuse and exposure to pornography; he was removed from his parents' home and visitation was ordered. The siblings confirmed their exposure to and participation in sexual acts. (*In re S.K.*, *supra*, E074453.) F.K. displayed inappropriate age-related behavior, including excessive masturbation, stating he wanted to see the "tooshies" (his name for vagina) of S.K. and other young girls, and he orally copulated and touched S.K.'s "tooshie." (*Ibid.*) S.K. told the social workers that F.K. had kissed, licked, and sucked on my "tooshie" multiple times. (*Ibid.*) F.K. again stated that he got the idea of putting his mouth on S.K.'s privates from movies he watched at mother's house, and he had seen a child "doing sex" to S.K. by "pushing the front privates together" during a visit to the Sundance film festival with his biological father. (*Ibid.*) Mother denied possessing pornography and exposing the children to any sexually explicit material. (*Ibid.*)

4

In January 2018, SCCS filed second amended subsequent petitions, which contained more specific allegations regarding the sexual abuse previously alleged. (*In re S.K.*, *supra*, E074453.) Following a contested hearing, the juvenile court found the allegations in these petitions to be true and ordered the matter continued for an 18-month review hearing. (*Ibid.*)

In June 2018, mother and father moved to San Bernardino County; S.K. was residing in a foster home, F.K. was residing in a group home, which offered a residential treatment and educational program, and A.M. was residing in an emergency foster home. (*In re S.K.*, *supra*, E074453.) Mother complied with her reunification plan, participated in parenting classes, was proactive in ensuring that A.M. received ongoing medical care, consistently visited the siblings, and had obtained housing, which was not physically hazardous. (*Ibid.*) She identified San Bernardino County as her home and reported having a strong natural support network. (*Ibid.*) In July 2018, Sonoma County initiated a transfer of the dependency of all the minors to San Bernardino County.

By October 9, 2018, mother had started sex offender specific therapy but continued to deny that F.K. had been sexually abused by herself and others. She opined that he could have been molested, exposed to sexually inappropriate material, or coached when he was placed with the maternal great-aunt or at the group home. (*In re S.K.*, *supra*, E074453.) The social worker expressed concern that mother "allowed her children to be sexually abused, allowed the abuse to continue through her denial, and ultimately participated in that abuse along with [the biological father of the siblings and father], causing incredible harm and trauma which she now refuses to acknowledge and help heal." SCCS requested termination of family reunification services to mother and

5

the setting of a section 366.26 hearing in order to develop a permanent placement plan. (*In re S.K.*, *supra*, E074453.)  On December 19, 2018, the Sonoma County juvenile court terminated reunification services and set a section 366.26 hearing as to the siblings only. (*In re S.K.*, *supra*, E074453.)

> B.      *Transfer of Dependency Proceedings to San Bernardino County.*

The siblings and A.M.'s dependency cases were transferred to San Bernardino County in 2019.  (*In re S.K.*, *supra*, E074453.) San Bernardino County Children and Family Services (CFS) filed a status review report on September 5, 2019, recommending the continuation of reunification services to mother and father regarding A.M., who remained in foster care in Sonoma County.  Both mother and father regularly visited with all of the minors, attended individual therapy and sex offender specific counseling, and had completed court-ordered parenting classes.

As to the siblings, CFS recommended they continue their "out-of-home placement," and requested a planned permanent living arrangement (PPLA) plan be ordered with the goal of adoption.  (*In re S.K.*, *supra*, E074453.)  S.K. was observed to be an active child who tended to need supervision, as she pushed the limits.  The social worker opined that she would benefit from further therapy.  It was noted that F.K. had nine changes in placement.  (*Ibid.*)  He struggled with behavioral and emotional dysregulation, had difficulty focusing and paying attention, would become oppositional when given directions, tended to initiate conflict with his peers and staff, required high staff support to manage his behavior, and continued to engage in power struggles seeking to control his environment.  Although he could verbalize his feelings, he would become overwhelmed and act out in anger.  (*Ibid.*)  Since the transfer to San Bernardino County,

6

F.K. had been referred to therapeutic services. CFS provided sibling visitation, which mother and father participated in without incident. (*Ibid.*)

### 1. *Initiation of dependency proceeding for M.M.jr*

Mother's fourth (father's second) child, M.M.jr was born in October 2019 at a birthing center and admitted to the hospital due to hypoxia. According to medical staff, the child suffered a heart condition that would have been detected in utero with appropriate prenatal care. He underwent heart surgery and required extensive follow-up medical care. CFS filed a petition under section 300, subdivisions (b), for medical neglect as the result of the parents' failure to seek consistent prenatal care, and subdivision (j), for the risk of sexual abuse similar to the siblings. M.M.jr was detained outside the home at Loma Linda University Children's Hospital. Supervised visitation was ordered once a week for two hours following M.M.jr's discharge from the hospital.

### 2. *Mother seeks increased visitation of the siblings and A.M.*

On November 5, 2019, mother requested increased and unmonitored visitation of the siblings and A.M., along with the reinstatement of her reunification services in order to transition the siblings home. (*In re S.K.*, *supra*, E074453.) She attended a sexual abuse program to address what had happened to her as a child, how it had influenced her as a mother, and to fully understand and prepare for the safe return of the siblings and A.M. (*Ibid.*) The social worker acknowledged mother's participation in counseling, parenting classes, and therapy, but reported that she "'has not made the beneficial changes necessary to protect her children.'" (*Ibid.*) Mother "'minimize[d] her involvement and lack of protective capacity,'" "'failed to take responsibility'" for her children's dental and medical neglect, and "minimize[d] the sexualized behaviors with

7

the children." (*Ibid.*) While mother "'initially appeared to be cooperative and forthcoming with information,'" she became resistant to providing information, such as any Indian family heritage and the circumstances of M.M.jr's birth and medical status. (*Ibid.*) The juvenile court denied mother's request because it did not "'believe there is prima facie evidence of a substantial change. Also, the court finds there is <u>NO</u> prima facie showing that the proposed change would be in the children's best interests.'" (*Ibid.*)

In the addendum report filed November 12, 2019, CFS did not recommend adoption given the siblings' behaviors. (*In re S.K.*, *supra*, E074453.) Given mother's receipt of services "'for a significant time prior to her case being transferred to San Bernardino County,'" coupled with the prior reports and the termination of her services, CFS recommended a PPLA with the goal of adoption. (*Ibid.*) On the same day, CFS filed an addendum report recommending the court terminate the parents' reunification services regarding A.M. and set a section 366.26 hearing with a plan of adoption. Mother continued to refuse to address the sexual allegations involving the siblings, and father "'denied his own conduct.'" CFS acknowledged that the parents' were engaged in court-ordered services; however, it noted that they "have not made the beneficial changes necessary to protect their" children as evidenced by their continuing "to minimize their involvement and lack of protective capacity." CFS added that mother's failure to address the siblings' medical needs resulted in F.K. having "a lifelong medical condition."

3.      *Section 366.26 hearing* (*the siblings*).

On November 14, 2019, the juvenile court found that termination of parental rights would not be detrimental to the siblings and that no adoptive parent had been identified. The court adopted a PPLA for the siblings, with the identified goal of adoption and

8

continued supervised monthly visitation.  (*In re S.K.*, *supra*, E074453.)  Mother appealed; we affirmed.  (*Ibid.*)

### 4. *Issues concerning the parents' visitation with the children.*

#### a. Visitation with A.M.

During a supervised visit between the parents and A.M. on November 19, 2019, the parents took the child to use the bathroom (despite the fact he wears diapers).  After A.M. returned to his foster mother, he would not allow her to change his diaper or bathe him as she normally did.  Instead, he screamed and cupped his penis with his hands, and later he woke up during the night screaming.  This behavior had not happened previously.  A.M. continued to act out after subsequent supervised visits.  The foster mother expressed concern that the child would exhibit harmful physical and emotional breakdowns for one to two days after visiting the parents.  CFS recommended the juvenile court find that the visits were detrimental to A.M. and temporarily suspend them.  Mother claimed that she took A.M. into the bathroom alone and did not observe any redness, issues, or concerns when she changed his diaper.  Father also took A.M. into the bathroom alone.  The court rejected CFS's recommendation but suspended any make-up visitation with the parents.

Because A.M. was struggling with behavioral issues following visitation with his parents, the foster parents sought and enrolled him in therapy for four hours each week.  Separately, he was diagnosed with a medical condition necessitating circumcision, which was performed almost one year later.

b.      Visitation with M.M.jr

On November 22, 2019, the juvenile court suspended mother's visitation with M.M.jr based on the hospital's concerns that she was endangering the baby. According to CFS, the concerns about mother's harmful visits included her presence in the hospital room when the child's feeding tube "'became loose, fell out and or [was] taken out'" but mother failed to inform hospital staff, her presence when the baby's oxygen alarm went off and she did not respond, and M.M.jr's recovery from high fevers and electrolyte abnormalities after mother stopped feeding him her breastmilk. When the oxygen alarm was triggered a nurse responded. Mother lowered M.M.jr from her chest and the baby's oxygen level returned to normal. Mother claimed that she was not attempting to smother the child, but merely holding him close to her chest to stimulate milk production. However, because of his heart failure, M.M.jr was intubated and given "NPO (nothing by mouth)." Additionally, the parents' interactions with hospital staff were described as poor and hostile. The parents lied about having custody of the siblings and A.M., and they repeatedly challenged hospital staffs' monitoring of M.M.jr's temperature, including bringing in their own thermometer and expressing concern that their readings differed from the nurses' readings.

5.      *Jurisdiction/Disposition report and hearing* (*M.M.jr*).

According to the jurisdiction/disposition report filed November 26, 2019, mother admitted that she had been molested as a child by an individual who was living in the home where the siblings had been placed and then removed. She knew the risk of placing the siblings in that home but allowed the placement without disclosing her sexual abuse by an occupant. Mother identified F.K. as her only child with a medical heart

condition and claimed she was unaware that M.M.jr "would also have a congenital heart condition." Mother had "'not taken responsibility' as to why CFS is involved with her family." Father denied that A.M. was medically neglected, stated that he met the siblings when they were three and five years old, and said he helped mother initiate their medical and dental appointments. Although father made progress in therapy, the therapist commented that he continued to "'den[y] his own conduct.'" According to CFS, the parents continued to minimize the sexualized behaviors with the siblings and deny that they perpetrated sexual abuse upon them. Because the parents' reunification services had been terminated as to the siblings and A.M., CFS asserted that reunification services concerning M.M.jr may not apply under section 361.5, subdivision (b)(10) & (b)(11), and recommended a concurrent plan of adoption.

On December 2, 2019, the juvenile court set a contested jurisdiction hearing but ordered that mother not breastfeed and/or provide breast milk for M.M.jr, and it maintained the prior order suspending visitation.

### 6.  *The children's placement with the B.'s.*

On February 20, 2020, CFS informed the juvenile court that when A.M. was detained in Sonoma County, he was placed in a Spanish-speaking home and, thus, he "speaks and responds more to Spanish than English." Following M.M.jr's recent discharge from the hospital, he was placed with A.M. in a concurrent home (with Mr. and Mrs. B.), which is bilingual and holds "a medical background and [is] able to support [M.M.jr's] medical needs and growth. This placement allows the children to remain together and embrace both of their individual needs."

11

On June 26, 2020, the B.'s submitted a request to become de facto parents of the children. The children had been placed in their care on February 21, 2020, but Mrs. B. had known A.M. since October 2019. Mrs. B. was a former registered nurse who volunteered at A.M.'s former foster parent's daycare. Mrs. B. speaks Spanish, assisted with the communication between A.M. and his former foster parent, and facilitated visitations. Mr. B. is an active firefighter and is trained as an emergency medical technician. On July 1, 2020, the juvenile court appointed the B.'s de facto parents of the children.

7.     *The interim review reports for the 12-month review* (*A.M.*) *and contested jurisdiction* (*M.M.jr*) *hearings.*

a.     Report for M.M.jr

According to the interim review report filed October 21, 2020, CFS continued to recommend no reunification services to the parents for M.M.jr and reduced parental visitation. The needs and service plans dated August 21, 2020, noted that M.M.jr was allowed supervised visitation with father but not mother. Both parents were allowed supervised visitation with A.M. While the visits appeared to be appropriate, father required the assistance of Mrs. B. to appropriately care for A.M. and help when he acted out. Although mother and father were participating in counseling, they continued to deny the sexual allegations found true against them in the older siblings' cases. There was no family member that CFS could recommend for placement of the children. However, they both appeared happy and comfortable with Mr. and Mrs. B., who wanted to adopt them.

b. Report for A.M.

According to the interim review report filed October 27, 2020, CFS continued to recommend termination of reunification services to parents for A.M.  The child persisted in acting out after visitation with them by being aggressive with his toys, crying, throwing tantrums, hitting the foster father and family pets, pulling his hair, and banging his head.  He was attending therapy to address these behaviors.  The therapist witnessed the child's dysregulation and self-harm, and opined that he became overwhelmed and confused because the parents kept telling him that they are his parents, not the foster parents, whom he called, "Papa" and "Momma."  A.M.'s negative behaviors escalated after the parents' visits, and he returned to calling the foster parents by their first names. With therapy, A.M. made some behavioral improvements; he sternly verbalized that the foster home was his house.

c. Report for the parents.

In mother's counseling progress report, it was noted that she was engaged; however, she did not discuss allegations of sexual abuse and claimed the children must "have learned that in the foster care system."  In father's report, it was noted that he "adamantly denies perpetrating any sexual abuse against the [siblings] and denies medically neglecting [A.M.]"  Father's progress was described as being "stagnant."

d. The hearing.

The 12-month review hearing for A.M. and the jurisdiction/disposition hearing for M.M.jr began on October 27, 2020.  After two days of testimony, the juvenile court designated Mr. and Mrs. B. as the educational rights holders for the children. Reunification services were terminated for A.M. and bypassed for M.M.jr, parental

13

visitation was terminated because it was deemed detrimental to the children's physical or emotional well-being, and a section 366.26 hearing was set. The parents filed notices of intent to file writ petitions; however, the petitions were dismissed as abandoned. (See *M.M. v. Superior Ct.* (*CFS*), Jan. 5, 2021, E076046; and *S.L. v. Superior Ct.* (*CFS*), Feb. 8, 2021, E076046.)

8. *Status review report and hearing* (*S.K.*)

Throughout 2020, mother participated in monthly supervised visitation with S.K.; however, according to the status review report filed November 6, 2020, the child's negative behaviors tended to increase after the visits. CFS, therefore, recommended that S.K. receive permanency planning services and that the juvenile court set a section 366.26 hearing and implement a permanent plan of legal guardianship. On November 6, 2020, the court found that it was in S.K.'s best interest to consider termination of parental rights and set another section 366.26 hearing.

9. *Section 366.26 report* (*the children & S.K.*).

According to the section 366.26 report filed January 30, 2021, CFS recommended termination of parental rights of the children and implementation of the permanent plan of adoption. CFS noted that the children were adoptable, an adoptive family had been identified, the children were attached to the adoptive family and regarded the adoptive parents as their parents.

In its section 366.26 report filed March 3, 2021, CFS recommended (1) a permanent plan of legal guardianship for S.K., (2) the case be dismissed, and (3) S.K. be discharged as a dependent of the juvenile court upon the issuance of letters of guardianship to Ms. W., the foster parent. Mother was participating in monthly visitation

14

with the child via video chat. Following visits, S.K. would "become destructive, defiant within the home [and would] attempt to project and manipulate situations. For example, the child tends to wipe feces on other people's belongings, decrease of honesty, destructive and tends to blame others, and emotional outbursts. Additionally, the child is reported to regress with her emotional stability after the visits. [S.K.] has made progress with her encopresis and enuresis with no accidents, except after the visits with her mother. The child tends to regress for the week after the visits but shortly returns her ability to control her bathroom needs thereafter." The child had been living with the foster mother since December 5, 2019; she was bonded to her and referred to her as "mom."

### 10. *Section 388 petitions* (*the children*).

On February 8, 2021, father filed a section 388 petition requesting the juvenile court reinstate his educational rights to the children and order family maintenance, or reinstate his educational rights and visitation, and order reunification services. For changed circumstances, he noted his completion of both fathering and parenting courses. He explained that his request was in the children's best interest "because [he] is dedicated to reunifying to provide a nurturing home to parent his children into adulthood." On February 10, 2021, the court summarily denied father's request because it did not promote the children's best interests.

On February 16, 2021, mother also filed section 388 petitions for both children. She requested the juvenile court set aside the upcoming section 366.26 hearing, return the children to her care and custody, and reinstate family maintenance services. Alternatively, if the court recognized special circumstances, she asked that the section

15

366.26 hearing be set aside and reunification services be reinstated. Mother alleged the changed circumstances included her certification as a nursing assistant, and her belief that "she has gained further insight into sexual abuse and would be appropriate and protective if offered reunification services." She explained that her request was in the best interests of the children because she loves and cares for them, the incalculable bonds between a mother and her children should not be severed, and she would help maintain sibling bonds. On February 17, 2021, the court summarily denied mother's request because it did not promote the best interests of the children. As to A.M., the court commented that her "purported progress is not nearly enough to overcome her burden of prima facie evidence of [best interest] to [the child] to change [the] prior court order." As to M.M.jr, the court added, "The court applauds mother's personal progress; however, based on totality of history and considering mother's purported new progress, the court does not believe that mother has proven even prima facie evidence of best interests."

The parents appeal the summary denial of their section 388 petitions.

### 11. *Father's motion for a bonding study.*

On February 23, 2021, father filed a motion for the appointment of an expert to conduct a bonding study. Father claimed that he shared a significant bond with the children, which was evident during their visitation prior to its termination on October 29, 2020. Father also claimed he was indigent and could not pay for a private bonding study. The juvenile court denied the motion, without a hearing, on the grounds it failed to identify the person who would conduct the study and the amount of money requested.

On February 25, 2021, father's counsel requested a release of records to pursue a private bonding study. Mother's counsel joined in the request and asked for a six-week

16

continuance. The children's counsel objected, contending that the request was untimely because the section 366.26 hearing had been set months prior, and counsel did not want the reports released to a third party. County Counsel joined in the children's counsel's objections and questioned how a bonding study could be done since it required observing the parents with the children, but the juvenile court had found visitation to be detrimental to the children. The court agreed with the children's counsel and County Counsel and denied the parents' requests.

12. *Section 366.26 hearings* (*the children & S.K.*).

The parents requested a contested section 366.26 hearing for the children and S.K., and the matter was set for April 12, 2021. On April 7, 2021, CFS provided further information to the court regarding S.K.'s negative behaviors following visitation with mother: "The child continues to exhibit negative behaviors after the visits, such as being defiant, engaging in sexual play (including attempting to put her finger in another child's rectum), manipulative behaviors, bed-wetting, emotional dysregulation, dishonesty and is seen to have spells of disengagement. For example, [S.K.] is observed to become more disengaged in activities as she disassociates, ignoring her surroundings and others. Additionally, the child is reported to regress and have nightly bed-wetting accidents for approximately one week after the visits with mother. The child is reported to be dishonest about different incidents and attempts to manipulate the situation, lack[s] responsibility and blaming others for her own actions. After the March visit, the child attempted to place her finger in another female child's rectum and then denied her actions blaming the other child for the type of play as she nonchalantly shrug[ed] her shoulders." Because of S.K.'s regression of behaviors and "uprooted sexual behaviors" immediately

17

after her visits with mother, CFS and S.K.'s counsel requested that the juvenile court find visitation with mother to be detrimental and terminate it.

On April 12, 2021, the paternal grandmother filed a section 388 petition asking that the children be placed back with their prior foster parents, their great-grandparents, or another suitable home. She explained that she became concerned about the B.'s after researching their background, which contained Mrs. B.'s application for a domestic violence restraining order against her former spouse, family child support orders involving Mrs. B. and her former spouse, and a traffic violation case against Mrs. B., wherein she failed to pay fines or appear in court. The juvenile court ordered CFS to submit an information packet regarding the appropriateness of the children's placement with the B.'s after investigating the paternal grandmother's concerns.

On April 12, 2021, mother's counsel objected to the requests for a finding that visitation was detrimental. Counsel stated "mother would like to indicate she was not aware of the sexualized behavior being exhibited by the minor. She is not the one that has custody of the child right now. She was not informed. She doesn't know how her visitation triggers such behavior, and she wants to maintain her visitation, which would allow her to maintain whatever bond there is left." The juvenile court found visitation was detrimental to S.K.'s physical or emotional well-being and no longer in her best interests, and the court ordered it terminated.

Proceeding with the section 366.26 hearing, the juvenile court admitted the social worker's reports and took judicial notice of all prior findings, orders, and judgments. Both parents testified regarding their visitation with the children. County counsel requested that the court terminate parental rights and select adoption as the permanent

18

plan. Counsel noted that visitation had been terminated in October 2020, and the parents do not occupy a parental role in the children's lives. The parent's counsel objected, argued the application of the parent-child exception, and requested a lesser permanent plan of guardianship. The children's counsel asked the court to follow the recommendation of CFS. The court found by clear and convincing evidence that the children were likely to be adopted and terminated the parental rights.

Both parents appeal.

## II. DISCUSSION

Both parents contend the juvenile court (1) erred by summarily denying their section 388 petitions, (2) denied them due process by terminating visitation with the children and, therefore, harmed their ability to establish the parental bond exception to adoption, and (3) abused its discretion in rejecting their request for a bonding study on the connection they share with the children. They also challenge the sufficiency of the evidence to support the finding that the children are adoptable. Separately, mother asserts that she was denied due process when the court found her visitation with S.K. to be detrimental and terminated all maternal contact.

*A.      Summary Denial of Section 388 Petitions.*

Both parents contend the juvenile court abused its discretion by summarily denying their section 388 petitions. We are not persuaded.

"Section 388 allows a parent or other person having an interest in a dependent child to petition the juvenile court to change, modify, or set aside any prior order because of changed circumstance or new evidence. (§ 388, subd. (a).) 'A juvenile court may summarily deny a section 388 petition without an evidentiary hearing, but "a petition

19

must be liberally construed in favor of its sufficiency [citation] and a hearing may be denied only if the application fails to reveal any change of circumstance or new evidence which might require a change of order.'" [Citation.] In determining whether a parent has made a prima facie showing under section 388, we may consider the entire factual and procedural history of the case. [Citation.] We review the juvenile court's summary denial of a section 388 petition for abuse of discretion." (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711; see *In re Angel B.* (2002) 97 Cal.App.4th 454, 460 [A decision to summarily deny a section 388 petition without an evidentiary hearing does not violate due process.].)

The parents contend that they made a prima facie showing of changed circumstances, and the proposed change would promote the best interests of the children. We need not decide whether the juvenile court erred in finding there was no prima facie showing of changed circumstances because both parents failed to make a prima facie showing that granting their section 388 petitions and reinstating reunification services and visitation was in the best interests of the children. (See *In re J.C.* (2014) 226 Cal.App.4th 503, 527 [A parent's petition to reopen reunification efforts "must establish how such a change will advance the child's need for permanency and stability."]; see also *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 225 ["[A] section 388 order for reunification services at this late date would deprive [the child] of a permanent, stable home in exchange for an uncertain future."]; Cal. Rules of Court, rule 5.570(d)(1) [juvenile court may summarily deny § 388 petition that fails to show change of circumstances or new evidence that demonstrates modification of prior order would promote best interests of child].) Once reunification services have been terminated, a

parent's interests are no longer paramount. Rather, the focus shifts from family reunification toward promoting the child's needs for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) In fact, a rebuttable presumption arises that reinstating services for a parent and potentially jeopardizing a permanent plan of adoption is not in the best interest of the child. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310.) Such presumption applies with even greater force when adoption is the permanent plan. (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 464.) The parents ignore this shift in focus.

Here, mother asserts that granting her petition would be in the children's best interests because she "had a relationship" with them, "most strongly with A.M.," and "reunification would accrue to their benefit." According to father, "there was prima facie evidence that it *appeared* the best interests of the children *may* be promoted by reuniting with their father because he could provide permanency for them in a stable and nurturing home." Viewed in the context of all the evidence in the juvenile court's record, the parents are unable to demonstrate that a new order was in the best interests of the children. We do not doubt the parents' commitment to the children. However, A.M. was removed from their care when he was one year old and M.M.jr. has never lived with the parents. The parents received years of services but failed to reunify with the children or the siblings, let alone progress to unsupervised visitation. During this time, the children have bonded with the B.'s who love them and have provided for all their needs, both medically and emotionally. In view of the circumstances, it is difficult to see how reinstating reunification services or visitation would be in the best interests of the children.

The parent's reliance on *In re Hashem H*. (1996) 45 Cal.App.4th 1791 (*Hashem H*.) is misplaced. In *Hashem H*., the appellate court found that the mother had made a prima facie showing of both changed circumstances and best interests of the child. In addition to other facts, the mother had done so well in conjoint therapy with her son, that the therapist recommended the child be returned to her. The court held that the section 388 petition showed that the mother's problems, which led to the removal, "had been successfully resolved through therapy." (*Id*. at p. 1799.) Such is not the case here. Unlike in *Hashem H*., mother's therapist noted that mother was engaged, but did not discuss allegations of sexual abuse and claimed the children must "have learned that in the foster care system." Father's prognosis for remediation of the problems that caused the dependencies was described as "stagnant" because he "adamantly denies perpetrating any sexual abuse against the [siblings] and denies medically neglecting [A.M.]"

Because the parents did not make a prima facie showing that the children's best interests would be served by reinstating reunification services and visitation the juvenile court did not abuse its discretion in summarily denying their section 388 petitions.

B.    *Termination of Visitation is not cognizable in this appeal from the order terminating parental rights.*

Both parents challenge the juvenile court's order terminating visitation with the children. They contend the order denied them due process and harmed their ability to establish the parental bond exception to adoption. CFS argues the order is not subject to further review on appeal following the parents' abandonment of their petitions for writ of extraordinary review. We agree with CFS.

"An order by the court that a hearing pursuant to [section 366.26] be held is not appealable at any time unless" a timely writ petition was filed, which "substantively addressed the specific issues to be challenged and supported that challenge by an adequate record" and "was summarily denied or otherwise not decided on the merits." (§ 366.26, subd. (*l*)(1)(B), (1)(C).)  Section 366.26, subdivision (*l*) reflects "'recent legislative efforts to expedite finality in dependency proceedings and to achieve permanency for children in the system.  [Citation.]  In *In re Anthony B.* [(1999)] 72 Cal.App.4th [1017,] 1023 . . . , the Court of Appeal extended "the bar of section 366.26, subdivision (*l*) [to] *all* orders issued at a hearing in which a setting order is entered."  The court in *In re Anthony B.*[, *supra*, 72 Cal.App.4th at p. 1023,] noted:  [¶] "The goals of expedition and finality would be compromised if the validity of these types of contemporaneous, collateral orders were permitted to be raised by appeal from the order itself or from a later permanent planning order and therefore allowed to remain undecided until well after the permanent plan was decided upon.  The desired expedition and finality obviously would be most threatened when the permanent plan was adoption and termination of parental rights, the preferred plan which must be ordered if the child is found adoptable and the juvenile court cannot make any of the findings set out in section 366.26, subdivision (c)(1)(A) through (D).""'"  (*In re Tabitha W.* (2006) 143 Cal.App.4th 811, 816; see *In re Merrick V.* (2004) 122 Cal.App.4th 235, 247 ["All court orders, regardless of their nature, made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ."].)  This "rule is the only way to ensure that all outstanding issues will have been reviewed by the Court of Appeal prior to the section 366.26 hearing and that it is both

23

conducive to judicial economy and sensitive to the increasing emphasis on the importance of expeditiously achieving finality in dependency matters in the best interests of the children affected by the process." (*In re Tabitha W*., at p. 817.)

Because the parents failed to seek extraordinary writ review (by abandoning their petitions), any issue regarding the propriety of the order terminating visitation is not cognizable on this appeal.[5] (§ 366.26, subd. (*l*); *In re Tabitha W*., *supra*, 143 Cal.App.4th. at p. 817.)

C.    *Substantial evidence supports the findings that the children were adoptable.*

Both parents challenge the sufficiency of the evidence supporting the juvenile court's adoptability finding. We reject their challenge.

---

[5] Even if we considered the merits of the issue and ruled in favor of the parents, the ruling would be irrelevant given the fact that the parents are unable to establish that the children would benefit from continuing the parent-child relationship, the second prong of the exception to the termination of parental rights. (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.* (2021) 11 Cal.5th 614, 632-633 (*Caden C.*).) In *Caden C.*, the Supreme Court stated: "[T]he focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.] Certainly, it is not necessary . . . to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' [Citation.] . . . [O]ften expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child." (*Caden C.*, at pp. 632-633.) Focusing on the children, we note that (1) A.M. only lived with the parents for his first year of life and M.M.jr never lived with them, (2) the parent's only contact with the children was during their supervised visits, and (3) visitation with the parents proved to be detrimental to both children.

"The [juvenile] court was not required to find the children 'generally' or 'specifically' adoptable. [Citation.] It was required only to find by clear and convincing evidence that the children were 'likely' to be adopted within a reasonable time . . . ." (*In re Mary C.* (2020) 48 Cal.App.5th 793, 802; see § 366.26, subd. (c)(1).) "'"Clear and convincing" evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.'" (*In re Amelia S.* (1991) 229 Cal.App.3d 1060, 1065.) On appeal, we review the court's determination for substantial evidence. (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223-224.)

"'The issue of adoptability . . . focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.'" (*In re Zeth S.* (2003) 31 Cal.4th 396, 406.) In cases where a minor may be considered unadoptable due to age, health, or mental or physical disability, the juvenile court may find that the child is specifically adoptable because a family has been identified as willing to adopt the child. (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408.) However, "[w]hen a child is deemed adoptable only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.) In determining adoptability, the juvenile court considers CFS's adoption assessment report and any other relevant evidence. (§§ 366.21, subd. (i)(1), 366.26, subd. (c)(1).)

Here, substantial evidence supports the adoptability finding. A.M. (three years old at the section 366.26 hearing) has no medical problem. He "is familiar with who [his parents] are but does not ask for [them] nor bring them up with his prospective adoptive parents." He receives therapeutic services because he "has behavioral [problems], defiance, tantrums, and behaviors such as hitting himself and throwing himself on the floor." M.M.jr (one year old) has a heart condition, which required two open-heart surgeries. Since leaving the hospital, he was placed with the B.'s and has had limited contact with the parents.

The B.'s live in a mountain community in an upper-middle-class neighborhood. Mrs. B. is a self-employed beautician, and Mr. B. is employed by a local fire department. Neither resided outside California or the United States within the past five years, and neither "have been charged with criminal or child abuse nor found guilty of such in the past." The couple are in their 40s and were married in February 2015. Mrs. B. had one previous marriage, which ended in divorce due to irreconcilable differences. The B.'s spend time with the children and enjoy outdoor activities. Although they were concerned about M.M.jr medical background and what A.M. was exposed to when he lived with mother and father, they remained committed to adopting the children. The B.'s are open to the children visiting their extended biological family; however, they will follow the court's order, which does not allow visitation with mother and father. The children have lived with the B.'s since February 2020, and they are mutually attached; the children "appear to regard both [Mr. and Mrs. B.] as their parental figures."

In the absence of some undisputed evidence of the B.'s inability to adopt the children or successfully parent them, the B.'s commitment to adopting the children is

26

sufficient to support the juvenile court's finding of adoptability. (See *In re Brandon T.*, *supra*, 164 Cal.App.4th at pp. 1409-1410 [affirming adoptability finding based on caretakers' commitment to adoption].)

Nonetheless, the parents argue there is insufficient evidence of adoptability for reasons that do not persuade us. They contend the children were neither generally nor specifically adoptable within a reasonable time because of A.M.'s developmental issues and M.M.jr's medical issues. They further assert Mrs. B.'s legal issues provide a "legal impediment" to adoption by the B.'s. Despite the children's developmental/medical issues, several people expressed a desire to adopt them, including A.M.'s former foster parents and the paternal grandmother.

Regarding Mrs. B.'s legal issues, none involve criminal child abuse issues. Rather, they involve Mrs. B.'s request for a domestic violence restraining order against her ex-husband, her dispute with him regarding medical insurance for their child, and Mrs. B.'s failure to pay for traffic violation citations or appear in court. The juvenile court addressed Mrs. B.'s legal issue by ordering CFS to investigate them and report back on its findings. Specifically, the court stated, "[I]f the children are not safe there, then we need to move them." Moreover, as CFS points out, the type of "legal impediment" to adoption as set forth in the Family Code does not include whether the adoptive parent was ever charged with a misdemeanor crime. (Fam. Code, §§ 8601 [adoptive parent must be at least 10 years older than the child, unless the adoption is by a stepparent, sister, brother, aunt, uncle, or first cousin and the court is satisfied that adoption by the parent and, if married, by the parent's spouse is in the best interests of the parties and is in the public interest regardless of the ages of the child and the adoptive parent], § 8602

27

[consent of a child over the age of 12 is necessary to the child's adoption], § 8603 [a married person, not lawfully separated, may not adopt a child without the consent of the spouse, provided the spouse is capable of giving consent].)  "In such cases, the existence of one of these legal impediments to adoption is relevant because the legal impediment would preclude the very basis upon which the social worker formed the opinion that the minor is likely to be adopted." (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1650.)

Because there is substantial evidence of A.M. and M.M.jr.'s general adoptability, the juvenile court did not err in determining the children were likely to be adopted.

D.       *Denial of Request for a Bonding Study.*

Both parents contend the juvenile court abused its discretion in rejecting their request for a bonding study on the connection they share with the children.  We find no abuse of discretion.

"Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C*., *supra*, 11 Cal.5th at p. 633, fn. 4.)  The decision to order a bonding study rests at the discretion of the juvenile court. (*In re Lorenzo C*. (1997) 54 Cal.App.4th 1330, 1339 (*Lorenzo C*.) ["There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order."]; accord, *In re S.R.* (2009) 173 Cal.App.4th 864, 871 ["[A] bonding study is not statutorily mandated in a dependency proceeding."].) Under Evidence Code section 730, the court may order a bonding study when it appears, "at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action . . . ." (Evid. Code, § 730; see *S.R*., at p. 869.)  An order denying a bonding study is reviewed for abuse of discretion.

28

(*Lorenzo C.*, at p. 1341.)  "The applicable standard of review is whether under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study."  (*Ibid.*)

When reunification services have been terminated, a bonding study is generally appropriate only in limited circumstances:  "Bonding studies after the termination of reunification services would frequently require delays in permanency planning. . . . [Thus,] the denial of a belated request for such a study is fully consistent with the scheme of the dependency statutes, and with due process."  (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197.)  In *Lorenzo C.*, the Court of Appeal concluded the juvenile court did not abuse its discretion where "the undisputed evidence was that there was some bonding between the father and Lorenzo but that the child had a stronger bond with the foster parents.  Also, the child was only two years old at the time of the section 366.26 hearing and had had no contact with his father during the preceding five months.  Under these circumstances, it is unlikely that a bonding study would have been useful to the juvenile court."  (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1341, fn. omitted.)

The facts here are indistinguishable from *Lorenzo C.*  A.M. had been in the parent's care for the first year of his life only, and M.M.jr. never lived with the parents.  Although the parents visited A.M. regularly and appeared to have a good relationship with him, mother acknowledges that she had not visited A.M. since October 2020 and M.M.jr since November 2019, shortly after his birth.  The children had been placed in a concurrent home (Mr. and Mrs. B.) since February 2020, and the parents filed their request for a bonding study in February 2021, the date originally set for the section 366.26 hearing, and four months after their visitation was terminated.  By that time, the

29

children had been in the B.'s care for one year, the B.'s wanted to adopt them, and they were bonded to the B.'s.  The juvenile court had already terminated reunification services, and it ordered visitation to be terminated after finding it was detrimental to the children—A.M. experienced negative behaviors following visits with the parents.  While the parents contend that a "bonding study was necessary to get a neutral assessment," they provide no basis as to why a bonding study would have been useful for the juvenile court at this point in the dependency.

Because the focus of the proceedings in February 2021 was the children's interest in permanency and stability (*Lorenzo C.*, *supra*, 54 Cal.App.4th at p. 1340), there's no basis for us to conclude the juvenile court acted unreasonably by refusing to order a bonding study.

### E.  Finding that Mother's Visitation with S.K. is Detrimental.

Finally, mother argues she was denied due process when the juvenile court found her visitation with S.K. was detrimental and terminated all maternal contact.  More specifically, she contends she was not provided sufficient notice that her visits with S.K. were detrimental nor was she given the opportunity to object to the termination of visitation.  We disagree.

Section 366.21, subdivision (h), requires the juvenile court to permit the parents continued visitation pending the section 366.26 hearing "unless it finds[, by preponderance of the evidence,] that visitation would be detrimental to the child."  (See *In re Manolito L.* (2001) 90 Cal.App.4th 753.)  Here, the evidence overwhelmingly supports the court's decision.

As early as October 2018, S.K.'s caregivers and therapist reported "'negative behaviors before and after visits'" with mother. (*In re S.L.*, *supra*, E074453.) Prior to the visit, she "isolate[ed] herself in the bedroom, [became] tearful for hours and act[ed] aggressively towards her foster mother.'" (*Ibid.*) On December 19, 2018, the Sonoma County juvenile court terminated mother's reunification services and set a section 366.26 hearing; however, a few weeks later, the matter was transferred to San Bernardino County. (*In re S.L.*, *supra*, E074453.) On November 5, 2019, mother filed a section 388 petition asking for reinstatement of her reunification services, an increase in visitation, and unsupervised visits. The court summarily denied the petition finding no prima facie showing that the proposed change would be in S.K.'s best interest. (*In re S.L.*, *supra*, E074453.) On November 14, 2019, mother submitted on the recommendation of the PPLA, with the identified goal of adoption, and supervised visitation was reduced to once a month for two hours. (*Ibid.*)

Throughout 2020, mother participated in monthly supervised visitation with S.K.; however, both the May 8 and November 6, 2020 status review reports noted that S.K.'s negative behaviors tended to increase after the visits. CFS recommended a permanent plan of legal guardianship. On November 6, 2020, the court found that it was in S.K.'s best interest to consider termination of parental rights and set a section 366.26 hearing. The section 366.26 report filed March 3, 2021, detailed S.K.'s negative behaviors following visitation as follows: the child "is reported to become destructive, defiant within the home, and attempts to project and manipulate situations. For example, the child tends to wipe her feces on other people's belong[ings], [there is a] decrease of honesty, [she becomes] destructive and tends to blame others, and [she suffers] emotional

31

outbursts. Additionally, the child is reported to regress with her emotional stability . . . . [She] has made progress with her encopresis and enuresis with no accidents, except after the visits with her mother. [She] tends to regress for the week after the visits but shortly returns [to] her ability to control her bathroom needs thereafter." A contested section 366.26 hearing was set.

On April 7, 2021, CFS filed a supplemental report, which expressed its concerns about S.K.'s behaviors following visitation with mother. It noted that, after visits, S.K. is "defiant, engag[es] in sexual play . . . , manipulative behaviors, bed-wetting, emotional dysregulation, dishonesty and is seen to have spells of disengagement. For example, [S.K.] is observed to become more disengaged in activities as she disassociates, ignoring her surroundings and others. Additionally, the child is reported to regress and have nightly bed-wetting accidents for approximately one week after the visits with mother. The child is reported to be dishonest about different incidents and attempts to manipulate the situation, lack[s] responsibility and blaming others for her own actions. After the March visit, the child attempted to place her finger in another female child's rectum and then denied her actions blaming the other child for the type of play as she nonchalantly shrugg[ed] her shoulders." Thus, at the contested hearing on April 12, 2021, CFS and S.K.'s counsel requested that the juvenile court find visitation with mother to be detrimental and terminate it. Over mother's counsel's objection, the court made the requested finding.

Mother's counsel noted that he was in possession of the section 366.26 report but had not seen the supplemental report. After being provided with a copy, he objected to the detriment finding, stating that mother wanted to "indicate she was not aware of the

sexualized behavior being exhibited by [S.K.] She is not the one that has custody of the child right now. She was not informed. She doesn't know how her visitation triggers such behavior, and she wants to maintain her visitation, which would allow her to maintain whatever bond there is left." Counsel for CFS noted that S.K.'s sexualized behavior was cited in the section 366.26 report. The juvenile court found visitation was detrimental to S.K.'s physical or emotional well-being and no longer in her best interests, and ordered it terminated.

Contrary to mother's claim, she was on notice of S.K.'s negative behaviors as early as October 2018, and throughout the dependency, and she was aware of the reason the siblings were removed from her custody. The detrimental effect of her visits was repeatedly described in reports prepared by social services agencies in both Sonoma and San Bernardino counties. These reports prompted S.K.'s counsel to request termination of visitation. The juvenile court's finding of detriment was made in open court in the presence of mother and her counsel. However, neither requested additional time to respond nor the opportunity to call S.K. as a witness in response to the request for the termination of visitation based on a finding of detriment. Moreover, reunification with mother was no longer the goal of S.K.'s dependency as CFS was recommending guardianship as the permanent plan.

In short, the section 366.26 report, along with several prior reports, provided mother notice of the effect her visitation was having on S.K., and on April 12, 2021, the juvenile court provided mother with an opportunity to object to the termination of visitation. Consequently, there was no violation of her due process rights.

## III.  DISPOSITION

The orders terminating mother's and father's parental rights to A.M. and M.M.jr and terminating mother's visitation with S.K. are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                                    J.

We concur:


RAMIREZ
            P. J.


MILLER
        J.

34